IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

EARTH ISLAND INSTITUTE, a non-profit organization,

        Plaintiff,

    v.

KATHLEEN MORSE, in her official capacity as Forest Supervisor for Lassen National Forest, RANDY MOORE, in his official capacity as Regional Forester for Region 5 of the United States Forest Service, and the UNITED STATES FOREST SERVICE,

        Defendants.

_____/

Case No. 2:08-cv-01897-JAM-JFM

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; ORDER GRANTING PLAINTIFF'S REQUEST FOR INJUNCTIVE RELIEF

    This matter comes before the Court on Plaintiff Earth Island Institute's ("Plaintiff") and Defendants Kathleen Morse, Randy Moore, and the United States Forest Service's (collectively "Defendants") cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Having considered the parties' submissions and arguments, and for the reasons set forth below, Defendants' motion is DENIED and Plaintiff's motion is GRANTED in part and DENIED in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Earth Island Institute ("Plaintiff") alleges Defendants Kathleen Morse, in her official capacity as Forest Supervisor for Lassen National Forest, Randy Moore, in his official capacity as Regional Forester for Region 5 of the United States Forest Service, and the United States Forest Service (collectively "Defendants") violated the National Environmental Policy Act ("NEPA") by making numerous errors in preparing the Champs Environmental Assessment ("Champs EA").

The errors in the Champs EA that Plaintiff alleges include failing to adequately divulge the methodology used to assess stand density and failing to ensure the scientific accuracy and integrity of the Champs EA.  Plaintiff also alleges Defendants violated the Sierra Nevada Forest Plan Amendment and the National Forest Management Act ("NFMA") by failing to monitor and to protect Management Indicator Species ("MIS").  Finally, Plaintiff also alleges Defendants violated the Administrative Procedure Act ("APA") by making decisions that were arbitrary, capricious, an abuse of discretion and not in accordance with the law.  Defendants deny the allegations in the Complaint and

aver that the project record complies fully with the APA, NEPA, and NFMA.

The instant motions before the Court are Plaintiff and Defendants' cross-motions for summary judgment. (Doc. # 28, 33, 36, 41). This matter is subject to record review under the APA, thus the matter will be resolved based on these motions. Oral argument was heard on the cross-motions for summary judgment on July 1, 2009.

II.   ANALYSIS

A.   <u>Legal Standard</u>

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims and defenses." <u>Cleotex v. Catrett</u>, 477 U.S. 317, 323-324 (1986).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. <u>Anderson v. Liberty Lobby, Inc.</u>, 447 U.S. 242, 248-49 (1986). If the moving party meets its burden, the burden of production then shifts so that "the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts

showing that there is a genuine issue for trial.'" <u>T.W. Elec.</u>
<u>Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626,
630 (9th Cir. 1987) (quoting Fed. R. Civ. P. 56(e) and citing
<u>Celotex</u>, 477 U.S. at 323).  The Court must view the facts and
draw inferences in the manner most favorable to the non-moving
party.  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655
(1962).

The mere existence of a scintilla of evidence in support of
the non-moving party's position is insufficient: "There must be
evidence on which the jury could reasonably find for [the non-
moving party]." <u>Anderson</u>, 477 U.S. at 252.  This Court thus
applies to either a defendant's or plaintiff's motion for
summary judgment the same standard as for a motion for directed
verdict, which is "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law." <u>Id.</u>

B.  <u>Standard of Review</u>

The Administrative Procedure Act ("APA") provides the
authority for the Court's review of decisions under NEPA and
NFMA.  <u>Lands Council v. McNair</u>, 537 F.3d 981, 987 (9th Cir.
2008).  Under the APA, an agency decision will be set aside only
if it is "arbitrary, capricious, an abuse of discretion, or
otherwise not in accordance with law."  5 U.S.C. § 706(s)(A);
<u>see</u> <u>Ecology Ctr., Inc. v. Austin</u>, 430 F.3d 1057, 1062 (9th Cir.

4

2005).  "Review under the arbitrary and capricious standard is narrow, and the reviewing court may not substitute its judgment for that of the agency."  Earth Island Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1156 (9th Cir. 2006).  Rather, the Court "will reverse a decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, has entirely failed to consider an important aspect of the problem, or offered an explanation 'that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  Id.

C. Governing Provisions

    The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.*, provides both procedural and substantive requirements.  Procedurally, it requires the Forest Service to develop and maintain forest resource management plans.  Id. § 1604(a).  After a forest plan is developed, all subsequent agency action, including site-specific plans, like the Champs Project challenged here, must comply with NFMA and the governing forest plan.  Id. § 1604(i); see Lands Council II, 537 F.3d at 989.

    The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, contains additional procedural requirements.  Its purposes are to ensure the decision-maker will have detailed

information on environmental impacts and to provide that information to the public.  Inland Empire Pub. Lands Council v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996).  The Forest Service must prepare an EIS, which identifies environmental effects and alternative courses of action, when undertaking any management project.  Id.; 42 U.S.C. § 4332(2)(C).  "In contrast to NFMA, NEPA exists to ensure a process, not to mandate particular results."  Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1063 (9th Cir. 2002).  The agency must only take a "hard look" at its proposed action.  Id. at 1070.

D. Standing

     In their motion for summary judgment, Defendants argue that Earth Island lacks standing to challenge the Champs Project because Earth Island "has not shown how the Champs Project will injure any member."  Defs' Motion for Summary Judgment, Docket # 33, 4:14-15.  In response, Earth Island asserts its standing and provides a supplemental declaration for additional support.  Pl's Response to Defs' Motion for Summary Judgment, Docket # 36, Attch. 2.  Defendants do not raise the standing issue in their reply to Earth Island's response.  See Defs' Reply to Pls' Response, Docket # 41.

     Organizations such as Earth Island may assert the standing of their members by showing that a particular member "is under threat of suffering 'injury in fact' that is concrete and

particularized." <u>Summers v. Earth Island Institute</u>, 129 S.Ct.
1142, 1149 (Mar. 3, 2009) (quoting <u>Friends of Earth, Inc. v.</u>
<u>Laidlaw Environmental Services (TOC), Inc.</u>, 528 U.S. 167, 180-81
(2000)).  In addition, the threat of injury must be "actual and
imminent" and "traceable to the challenged action," and it must
be "likely that a favorable judicial decision will prevent or
redress the injury."  <u>Id.</u>  An injury that "affects the
recreational or even the mere esthetic interests of the
plaintiff" will suffice to establish standing.  <u>Id.</u>  <u>See also</u>
<u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 563-63 (1992);
<u>Sierra Club v. Morton</u>, 405 U.S. 727, 734-36 (1972).

In <u>Summers</u>, the plaintiff sufficiently established standing
in the district court by alleging in affidavits that a member of
the plaintiff's organization had visited the area of concern,
had imminent plans to return, and that the member's interests in
viewing flora and fauna in the area would be harmed by the
proposed project if the project went forward as planned.
<u>Summers</u>, 129 S.Ct. at 1149.  Here, Earth Island asserts standing
by alleging that member Dr. Chad Hanson visited the Champs
Project area in 2008 and on June 29, 2009 and that his esthetic
interests in the area, including viewing native woodpecker
species and the occasional Pronghorn Antelope, would be harmed
if the current Champs Project proposal is implemented.  Decl. of
Dr. Chad Hanson, Docket # 31, ¶¶ 7-8, 10; Supp. Decl. of Dr.

Chad Hanson, Docket # 36, Attch. 2, ¶¶ 3-5; Decl. of Dr. Chad Hanson in Support of [Proposed] Order for Permanent Injunction, Docket #52.   These assertions are sufficient to demonstrate the threat of imminent "injury in fact," resulting from the current Champs Project proposal, which could potentially be remedied by a favorable judicial decision.

Accordingly, Defendants' motion for summary judgment with respect to the issue of standing is DENIED.

E. Waiver

Defendants allege that Earth Island has waived any legal claims based upon the maximum stand density index ("SDI-Max") issue because Earth Island did not raise this issue during the administrative comment period.   Defs' Motion for Summary Judgment, Docket # 33, 5:10-6:4.   Defendants rely on Dept. of Transp. v. Public Citizen, 541 U.S. 752 (2004) to assert that unless an intervenor participating in the NEPA administrative process "alerts the agency" of all of its concerns and objections during the administrative comment period, those concerns and objections are waived as legal claims.   See id. at 764 ("Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration."

(quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 553 (1978))).

As Earth Island notes, the cases cited by Defendant to support their waiver claim, including Public Citizen, apply to the narrow context of "a failure by plaintiffs to provide the agency with timely notice that it should have considered another NEPA alternative."  Pls' Reply to Cross Motion for Summary Judgment, Docket # 36, 1 n.3.  In Public Citizen, the Supreme Court held that an intervenor's failure to identify alternatives during the administrative comments period forfeited any objection concerning the agency's failure to discuss potential alternatives.  541 U.S. at 764-65.  See also North Idaho Community Action Network v. U.S. Dept. of Transp., 545 F.3d 1147, 1156 n.2 (9th Cir. 2008) (holding that any objection to consider the alternative in question has been waived because the alternative in question was not raised until after the comment period had closed); 'Ilio'ulaokalani Coaltion v. Rumsfeld, 464 F.3d 1083, 1092 (9th Cir. 2006) ("This court has declined to adopt 'a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision.'" (quoting Kunaknana v. Clark, 742 F.2d 1145, 1148 (9th Cir. 1984))).  Likewise, in Vermont Yankee, the case which originated the "alerts the agency" language in Public Citizen, the Court rejected a NEPA claim based upon the agency's

9

alleged failure to consider an energy conservation alternative because the alternative was not raised until over a year after the final project environmental statement had been completed. 435 U.S. at 550-53.  Here, Defendants do not allege that Earth Island failed to propose meaningful alternatives.  In fact, the Forest Service maintains that it considered and subsequently rejected two proposed alternatives by Earth Island which are in harmony with the SDI-Max claim.  See Defs' Motion for Summary Judgment, Docket # 33, 20:1-5; Pl's Motion for Summary Judgment, Docket # 28, 17:17-22.

Moreover, Earth Island sufficiently notified the Forest Service of the relevant positions and claims during the comment period.  The Supreme Court has made clear that the primary responsibility for NEPA compliance is with the government agency.  Dept. of Transp. v. Public Citizen, 541 U.S. 752, 765 (2004) ("[T]he agency bears the primary responsibility to ensure that it complies with NEPA . . . .).  The responsibility of a intervenor is to "participate[] in a sufficiently meaningful way" so as to "alert[] the agency to its position and claims." City of Sausalito v. O'Neill, 386 F.3d 1186, 1208 (9th Cir. 2004).  There is no requirement that an intervenor must make every specific legal claim in the comment period or forfeit the right to bring a case in federal court.  Rather, a party need

only alert the agency to its contentions so that the agency may fully consider those contentions during the commenting period.

The Forest Service was put on notice of Earth Island's questions regarding the methodology and the figures used to determine stand density as well as Earth Island's accusations of over-thinning.  Earth Island made repeated inquiries to the Forest Service regarding stand density figures in the Champs area.  AR459, AR534, AR1607-08, AR9285-87.  Earth Island repeatedly accused the Forest Service of proposing more thinning in proportion to the given SDI-Max than necessary.  AR459, AR534, AR1607-08, AR 9297.  Additionally, Earth Island noted that the Forest Service calculated current SDI in one instance as well above 100% of SDI-Max.  AR9286.  Based on these inquiries, the Forest Service should have been sufficiently aware of potential stand density and SDI-Max issues so as to be fully able to consider these issues during the commenting period. Accordingly, Defendants' waiver argument fails as a matter of law and summary judgment in Defendants favor on this issue is DENIED.

F. Exhaustion of Administrative Remedies

Defendants allege that because Earth Island did not directly question the accuracy of SDI-Max used for ponderosa pine in the Champs project, it has failed to exhaust its administrative remedies pursuant to 7 U.S.C. § 6912(e) and 36

C.F.R. § 215.21.  Defs' Motion for Summary Judgment, Docket # 33, 6:5-7:4.  This Court disagrees.

"The Administrative Procedure Act requires that plaintiffs must exhaust available administrative remedies before bringing their grievances to federal court."  Idaho Sporting Congress v. Rittenhouse, 305 F.3d 957, 965 (9th Cir. 2002); 5 U.S.C. § 704. 7 U.S.C. § 6912(e), which pertains to the Department of Agriculture and consequently the Forest Service, states that "a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction . . . ."  Id.  See also 36 C.F.R. § 215.21 ("It is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to appeal is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the appeal procedures in [7 U.S.C. § 6912(e)].")  "[P]laintiffs have exhausted their administrative appeals if the appeal, taken as a whole, provided sufficient notice to the Forest Service to afford it the opportunity to rectify the violations that the plaintiffs alleged."  Native Ecosystems Council v. Dombeck, 304 F.3d 886, 899 (9th Cir. 2002).  In order to provide sufficient notice, a claimant need only alert the agency in "general terms, rather than [with] precise legal

formulations." <u>Rittenhouse</u>, 305 F.3d at 965 (citing <u>Dombeck</u>, 304 F.3d at 900).

As previously stated, Earth Island's concerns of miscalculated stand densities and over-thinning alerted the Forest Service of Earth Island's allegations.  While Earth Island did not specifically question the Forest Service's use of 365 as the SDI-Max for ponderosa pine, such a precise accusation is not required by 5 U.S.C. § 704 or 7 U.S.C. § 6912(e).  <u>See</u> <u>Rittenhouse</u>, 305 F.3d at 965.  Earth Island's general accusations of over-thinning, in the context of concerns over the Forest Service's calculations of SDI in the Champs area and use of an allegedly arbitrary percentile to determine the amount of thinning to be done, are sufficient to meet the aforementioned notice standard.  Earth Island repeatedly accused the Forest Service of proposing more thinning in proportion to the given SDI-Max than necessary.  AR459, AR534, AR1607-08, AR 9297.  These accusations should have alerted the Forest Service to the possibility that perhaps it was not the percentile used, but the size of the SDI-Max figure itself that was causing Earth Island to question the amount of thinning proposed.  Upon review of Earth Island's contentions, the Forest Service had the opportunity to rectify or explain its use of SDI-Max in the Champs project and thus Earth Island has exhausted its

administrative remedies. Accordingly, Defendants Motion for Summary Judgment on this issue is DENIED.

G. Maximum Stand Density Index (NEPA)

Stand density index or SDI, converts a stand's current density into a density at a constant reference tree size of 10 inches in diameter to allow comparisons between stands with different sizes and numbers of trees. AR1994. Maximum Stand Density Index, or SDI-Max, is the maximum number of such trees that can possibly occupy a given acre of forest for a given forest type. AR1994, AR5437. SDI-Max is an intrinsic biological maximum, and it is not possible for a forest stand's current condition to exceed this value. AR5437; Pinjuv Dec. ¶ 8. The central use of SDI-Max is to determine when a forest stand is beginning to approach its capacity, and thus when some trees might begin to die due to competition. Pinjuv Dec. ¶ 11. Limiting-SDI is an SDI value at which significant mortality from competition and beetles can occur as stands ultimately grow towards their maximum density (SDI-Max). AR5437, Pinjuv Dec. ¶¶10-11. SDI-Max and limiting-SDI are not interchangeable, rather they are distinct scientific concepts with fundamental differences.

Plaintiff alleges the Forest Service ("FS") failed to ensure the scientific accuracy and integrity of its analysis in the Champs EA when it used an erroneous maximum stand density

index ("SDI-Max") value of 365 to support the intensity of tree removal it proposed.  Pl's Mot. for Summary Judgment, Doc. # 28, 2:20-25.  Plaintiff argues the correct SDI-Max for ponderosa pine is 571, not 365 as Defendants assert.  According to Plaintiff, the erroneous scientific data used by the FS resulted in an overstatement of the current density of the forest which artificially created a "need" to intensively log medium and large trees from the project area.  Id. at 4:10-14; Pinjuv Dec. ¶¶ 8-16.  Plaintiff argues this resulting scientific inaccuracy was an arbitrary and capricious alteration of science.  Pl's Mot. for Summary Judgment, Doc. # 28, 3-7.  Defendants, on the other hand, contend the FS made technical conclusions based on its expertise in determining 365 as the SDI-Max value for ponderosa pine and that the scientific literature supports that figure.  Defs' Motion for Summary Judgment, Docket # 33, 7:6-22.

Under NEPA, "agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements.  They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement."  40 C.F.R. § 1502.24.  The Ninth Circuit applies this standard to EAs as well as EIS's.  Idaho Sporting Congress v. Thomas, 137 F.3d 1146, 1152 (9th Cir. 1988).  Agencies have wide discretion in assessing scientific

evidence, but they must "take a hard look at the issues and respond[] to reasonable opposing viewpoints." <u>Earth Island Inst. v. United States Forest Serv.</u>, 351 F.3d 1291, 1301 (9th Cir. 2003). "Because analysis of scientific data requires a high level of technical expertise, courts must defer to the informed discretion of the responsible federal agencies." <u>Id.</u> "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own experts, even if a court may find contrary views more persuasive. At the same time, courts must independently review the record in order to satisfy themselves that the agency had made a reasoned decision based on its evaluation of the evidence." <u>Id.</u> (quoting <u>Marsh v. Or. Natural Res. Council</u>, 490 U.S. 360, 378 (1989)). If an agency has failed to make a reasoned decision based on an evaluation of the evidence, the Court may properly conclude that an agency had acted arbitrarily and capriciously. <u>Id.</u> at 1301.

Here, as stated in the Champs EA, the FS intended to utilize SDI-Max, not limiting-SDI, when designing its thinning project. AR1994. Although the FS is free to design a project using some percentage of limiting-SDI as their benchmark for thinning, the FS chose not to do so in this case. Instead, the FS informed the public they designed a project using SDI-Max. AR1994. Specifically the Champs EA provides, "Thinning

treatments would attempt to ensure that stand densities do not exceed an upper limit of 60 percent of maximum SDI in order to reduce health risks associated with density." AR1994.  The Champs EA further states that ponderosa pines have a "suggested maximum SDI of 365." AR1994 citing Oliver Report, AR5436-41. As such, the FS was bound to insure "the professional integrity, including scientific integrity" of their use of 365 as the SDI-Max value.  If the Forest Service in the Champs EA provided inaccurate or highly misleading scientific data, then it violated NEPA.  Earth Island Institute v. U.S. Forest Service, 442 F.3d 1147, 1166-1167 (9th Cir. 2006)("Earth Island II").

Here, to assess stand densities in the Champs Project area, the FS gathered field data from plots within the project area. AR1638-1799.  The data gathered included the number of live trees per acre, species and size of trees, as well as the number of dead trees per acre.  Id.  The FS then input this information into a computer program known as the Forest Vegetation Simulator ("FVS").  AR2073.  The FVS then used this information to generate data, including the given stand's density index.  See e.g., AR2977.  When the FS ran its thinning scenarios through the FVS, it used an SDI-Max value for ponderosa pine of 365. AR3252, AR3254, AR3413, AR3415, AR3577, AR3579.

To support the use of 365 as the SDI-Max value the FS in the Champs EA cites to Oliver (1995) and erroneously asserts

that "Pines have a suggested maximum SDI of 365." AR1994.  The

Oliver (1995) study, however, explains that the value of 365 "is

considerably below the maximum SDI of 500 [for ponderosa pine]

used in Region 5 . . ."[1]  AR5437 (emphasis added).  The Oliver

study did not identify two different SDI-Max values for

ponderosa pine but, rather explicitly identified 365 as the

limiting-SDI and identified a much higher value as SDI-Max.

AR5437.  Moreover, figures 1A, 1B and 1C in the Oliver study

demonstrate that the line representing 365 is for limiting-SDI,

and shows numerous ponderosa stands far exceeding 365 trees per

acre 10 inches in diameter, and reaching about 570 (Fig. 1A),

550 (Fig. 1b), and 560 (Fig. 1C).  ARR5438.  As such, Oliver

(1995) clearly states that an SDI of 365 represents the

"limiting-SDI", not the SDI-Max for ponderosa pine and thus, the

FS erred in using 365 as the SDI-Max value in its thinning

calulations.

In addition to the Oliver (1995) study, Defendants argue

two Forest Service expert papers justify their use of 365 as the

SDI-Max value.  Defs' Reply, Doc. #41 at 3:15-21; AR5539;

AR5720.  The two FS expert papers were not noted in the Champs

EA and therefore, Defendants made no explicit reference by

---

[1]     In 1995 when the Oliver study was published, the then
current scientific knowledge was that SDI-Max for ponderosa pine
was 500, whereas subsequent studies have established SDI-Max at
571.  AR 2973; Pinjuv Dec.  ¶ 9.

footnote to the scientific studies nor disclosed these FS expert papers to the public during the comment period.   Nevertheless, Defendants now argue they are supportive scientific literature for their decision to use 365 as the SDI-Max for ponderosa pine. Id.   As such, the Court will briefly address the FS expert papers.

The first FS expert paper cited by Defendants concludes "Bark beetles define ponderosa pine's maximum SDI at 365 . . ." AR5539.   However, the FS paper relies solely on the Oliver study for its assertion.   Therefore, the FS paper mischaracterizes the Oliver study's findings because, as stated above, the Oliver study clearly states 365 is the limiting-SDI value.   The other FS paper relied upon by Defendants contains a table ("table 1") which states 365 is the SDI for ponderosa pine.   AR5720. However, nowhere in the FS paper does it state that table 1 demonstrates an SDI-Max value for ponderosa pine.   To the contrary, the paper explains "the values in table 1, . . . ., come from a least squares fit of equation (1) using data collected from stands across a range of ages, sites, and tree sizes, that appeared to be *normally stocked*."   AR5720.   Thus, it appears the table lists values of SDI for "normal" stands, not a maximum stand density.   Accordingly, this Court finds that the two FS expert papers do not support Defendants' use of 365 as the SDI-Max value.

In sum, after independent review of the record the Court finds that the FS has not made a reasoned decision based on an evaluation of the evidence.  <u>Marsh v. Ore. Natural Res. Council</u>, 490 U.S. 360, 378 (1989).  Here, the Forest Service's misinterpretation of Oliver (1995) and erroneous use of limiting-SDI of 365 as the SDI-Max value for ponderosa pine corrupted the scientific accuracy and integrity of its NEPA analysis.  40 C.F.R. §1502.24.  Agencies simply do not have the discretion to arbitrarily and capriciously alter a scientifically set value or deviate from a forest planning directive and still comply with NEPA.  <u>Native Ecosystems Council v. U.S. Forest Service</u>, 418 F.3d 953, 964-65 (9th Cir. 2005); <u>Earth Island II</u>, 442 F.3d at 1160-67 (whether the error was intentional or unintentional, the Forest Service violated NEPA by misrepresenting a scientific study to justify logging more larger trees).  The Forest Service has not provided a reasoned explanation for its decision to use a limiting-SDI value when its binding Champs EA provides it will use an SDI-Max value for thinning.  As such, this Court finds Defendants acted arbitrarily and capriciously when they used 365 as the SDI-Max value in calculating its forest thinning scenarios.

Accordingly, Plaintiff's motion for summary judgment on the issue of whether Defendants violated NEPA by failing to ensure

the scientific accuracy and integrity of the Champs EA is GRANTED.

H. Blackwell Memo

The Blackwell Memo ("Memo") is a letter directed to Region 5 forest supervisors and directors from Jack A. Blackwell, Regional Forester, dated July 14, 2004.  AR1454.  The Memo states that forest supervisors and directors should "ensure that density does not exceed an upper limit (for example: 90% of normal basal area, or 60% of maximum stand density index); this is a prudent way to avoid the health risks associated with density."  Id.  The Memo further advises that when designing thinnings supervisors and directors should "ensure that this level will not be reached again for at least 20 years after thinning."  Id.  This specific language from the Memo is incorporated into the Champs Project.  AR1994.

Plaintiff argues the Memo is a reviewable final agency action because its application in the Champs Project marks the consummation of the FS's decision making process, "by which rights or obligations have been determined or from which legal obligations flow."  Pl's Opp., Doc. # 36 at 10:3-7 citing Bennett v. Spear, 520 U.S. 154, 177 (1970).  Plaintiff asserts obligations flow from the Memo because it mandates a departure from forest plan snag recruitments for wildlife.  Pl's Opp.,

Doc. # 36 at 10:7-8.  Defendants, on the other hand, argue the Memo is not a final agency action under the APA, 5 U.S.C. § 704. Defs' Reply, Doc. # 41 at 6:5-28, 7:1-2.

This Court has no jurisdiction under the APA to review the Memo if it is not a final agency action over which Congress has waived sovereign immunity.  Rattlesnake Coal. v. EPA, 509 F.3d 1095, 1104-05 (9th Cir. 2007) ("The APA applies to waive sovereign immunity only after final agency action.  5 U.S.C. § 704.  Before final agency action has occurred, an action . . . is premature and a federal court lacks subject matter jurisdiction to hear the claim.").  "[T]wo conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decision-making process – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow . . ." Bennett v. Spear, 520 U.S. 154, 177-178 (1997) (quotations and citations omitted); see also Franklin v. Mass., 505 U.S. 788, 797 (1992).

Here, neither of the sentences Plaintiff cites nor any of the remainder of the Memo "mark[s] the consummation of the agency's decision-making process." Bennett, 520 U.S. at 178. Rather, the Forest Service's Champs Decision Notice by choosing Alternative 9 from the EA and selecting the upper limits is the

final agency action, not the Blackwell Memo.  AR1966.  The

Blackwell Memo provides, at most, a general statement of policy

and a general goal because it makes nothing certain until the

project level.  Therefore, the Memo is not subject to challenge

because it does not mark the consummation of the agency's

decision-making process.

Plaintiff argues that the Memo requires the FS to "'ensure'

that density does not exceed 60% of SDI-Max and [to] 'ensure'

that this level will not be reached again for at least 20 years

after thinning."  Pl.'s Opp., Doc. # 36 at 13:1-8.  The first

sentence of the Memo, however, merely states that the forest

thinnings should adhere to "*an* upper limit."  AR1454 (emphasis

added).  This gives complete discretion to the project designers

to decide what upper limit to use to design thinnings.  Nothing

in the Memo requires the designer to set an upper limit at 60 %

SDI-Max.  The second sentence of the Memo merely cites that

level as an example and recommends that project managers ensure

that their chosen, discretionary, density-levels remain

effective for twenty years.  AR1454.

By leaving project designers broad discretion to choose the

upper density limit, this guidance does not meaningfully

constrain any FS action.  At most, it gives project designers

guidance on how long to make their thinnings effective.

Therefore, because it leaves so much discretion to the project

designer over the ultimate decision, the Memo does not mark the consummation of the decision-making process.  <u>Sakar Int'l, Inc. v. United States</u>, 516 F.3d 1340, 1344 (Fed. Cir. 2008) ("the letter did not actually represent the 'consummation of the agency's decision-making process' because [the agency] retained discretion over the ultimate decision . . . .").  Accordingly, because the Blackwell Memo offers ample latitude to the FS supervisors and directors to apply the recommendations, it does not mark the consummation of the agency's decision-making process.

Moreover, even if the Memo constituted the consummation of the FS's decision-making process, it would not be a final agency action because no legal consequences flow from it.  Instead, only further actions, like decisions on projects, ever determine any rights or obligations.  The Memo does not allow, prohibit, or require, anyone to do anything.  It does not have any "direct and immediate effect on the day-to-day operations of the party seeking review," and whether anyone "immediate[ly] compli[es]" with the terms is irrelevant because it provides no standard by which to determine compliance.  <u>See</u> <u>Pub. Util. Dist. No. 1 v. Bonneville Power Admin.</u>, 506 F.3d 1145, 1152 (9th Cir. 2007) (providing indicia of finality); <u>Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs</u>, 543 F.3d 586, 594 (9th Cir. 2008).

"[T]he fact that a statement may be definitive on some issue is insufficient to create a final action subject to judicial review." Indus. Customers of Nw. Utils. v. Bonneville Power Admin., 408 F.3d 638, 646 (9th Cir. 2005) (Northwest Utilities). In Northwest Utilities, the court held that a final decision in one phase of a three-phase process creates no final agency action. Similarly, here, even if the Memo is one part of the process, like the first phase of development at issue in Northwest Utilities, no legal consequences flow from the Memo. It neither marks the consummation of the agency's decision-making process nor creates any legal rights or obligations. As such, this Court does not have jurisdiction under the APA to review the Memo.

Accordingly, Plaintiff's motion for summary judgment on the issue of whether the Blackwell Memo was a final agency action and thus subject to NEPA review is DENIED.

### III. ORDER

For the reasons set forth above, Defendants' motion for summary judgment is DENIED and Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part.

The Court, having granted summary judgment, in part, to Plaintiff, hereby ORDERS the following injunctive relief against Defendants:

The Champs Project and any contracts that implement the Champs Project (except activities as described below) are hereby permanently enjoined until the Forest Service conducts an adequate and sufficient National Environmental Policy Act ("NEPA") review as discussed above in this Court's Order. In the interim, thinning of trees less than twelve inches in diameter at breast height that have been identified for removal pursuant to the Champs Project will be allowed, including by means of service contract.  In addition, the removal and cleanup of slash debris generated from this allowable activity, as well as the prescribed burning in units of the Champs Project as detailed in the Champs EA, are also permitted.

IT IS SO ORDERED.

Dated:  August 5, 2009

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE