UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EARTH ISLAND INSTITUTE, a non-profit organization,<br><br>            Plaintiff,<br><br>     v.<br><br>JERRY BIRD, in his official capacity as Forest Supervisor for Lassen National Forest, RANDY MOORE, in his official capacity as Regional Forester for Region 5 of the United States Forest Service, and the UNITED STATES FOREST SERVICE,<br><br>            Defendants. | Case No. 2:08-CV-01897 JAM-JFM<br><br>ORDER GRANTING DEFENDANTS' MOTION TO DISSOLVE THE INJUNCTION |

This matter is before the Court on Defendants' Jerry Bird, Randy Moore and the United States Forest Service (the "Forest Service") (collectively "Defendants") Motion to Dissolve the Injunction (Doc. #88). Plaintiff Earth Island Institute ("Plaintiff") opposes the motion. (Doc. #93). The Court heard oral argument on the motion on August 24, 2011. Defendants seek to dissolve the injunction ordered by this Court on August 5, 2009.

1

See Earth Island Institute v. Morse, 2009 WL 2423478 (E.D. Cal. Aug. 5, 2009). Based on the moving papers, the administrative record and oral argument, the Motion to Dissolve the Injunction is GRANTED.

I.   FACTUAL AND PROCEDURAL BACKGROUND

The factual and procedural background leading up to Defendants' present motion are fully discussed in the Court's previous order granting injunctive relief, (Earth Island, *supra*), and the Court's order denying Defendants' request for reconsideration of the injunction. (See Earth Island Institute v. Morse, 2009 WL 4163846 (E.D. Cal. Nov. 20, 2009).)

The Court enjoined the Champs Project ("the project") until the Forest Service completed an "adequate and sufficient [NEPA] review." Earth Island, 2009 WL 2423478 at *10. While the injunction has been in place, Defendants have prepared a supplement ("SEA") to the original Champs Environmental Assessment ("EA"). A draft SEA was opened to public comment for 30 days, and the Forest Service responded in detail to the public comments, including those submitted by Plaintiff, before completing the final SEA. After review of the public comments and the Forest Service's responses, Jerry Bird issued a finding of No Significant Impact ("FONSI"), concluding that the SEA did not require further environmental analysis or a modified decision.

In its Order granting injunctive relief, Earth Island, 2009 WL 2423478, the Court held that Defendants violated the National Environmental Policy Act ("NEPA") by failing to ensure the scientific accuracy and integrity of the EA. Defendants assert

that they are now in compliance with NEPA and with the Court's order, and ask the Court to dissolve the injunction so that they may proceed with the proposed project. Plaintiff contends that the SEA does not comply with NEPA and is in defiance of the Court's previous orders. Further, Plaintiff raises three additional alleged NEPA violations that were not addressed previously by the Court, arguing that these potential violations provide support for maintaining the injunction.

## II.  OPINION

### A.  Legal Standard

A court which issues an injunction retains jurisdiction to modify the terms of the injunction if a change in circumstances so requires. Nicacio v. United States Immigration & Naturalization Serv., 797 F.2d 700, 706 (9th Cir. 1985), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037 (9th Cir. 1999). Federal Rule of Civil Procedure 60(b)(5) allows courts to relieve a party or its legal representative from a final judgment, order or proceeding if the judgment has been satisfied, released, or discharged. Fed. R. Civ. Proc. 60(b)(5). Rule 60(b) codifies the long-established principle of equity practice that a court may, in its discretion, take cognizance of changed circumstances and relieve a party from a continuing decree. Gilmore v. California, 220 F.3d 987, 1007 (9th Cir. 2000).

A party seeking dissolution of an injunction may meet its initial burden by demonstrating that there has been a significant change in facts or law. Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367, 384 (1992); see also Sharp v. Weston, 233 F.3d

1  1166,1170 (9th Cir. 2000) ("a party seeking modification or
2  dissolution of an injunction bears the burden of establishing that
3  a significant change in facts or law warrants revision or
4  dissolution of the injunction").  A significant change is one that
5  pertains to the underlying reasons for the injunction.  Moon v.
6  GMAC Mortgage Corp., 2008 WL 4741492, at *2 (W.D. Wash. Oct. 24,
7  2008) (citing United States v. Swift & Co., 189 F. Supp. 885, 905
8  (D. Ill. 1960), aff'd per curium, 367 U.S. 909 (1961)).  Under a
9  flexible standard based on Rule 60(b)(5), the Ninth Circuit has
10 directed courts to take all the circumstances into account in
11 determining whether to modify or vacate a prior injunction or
12 consent decree.  Orantes-Herndandez v. Gonzales, 504 F.Supp.2d 825,
13 830 (C.D. Cal. 2007); aff'd, 2009 WL 905454 (9th Cir. 2009).
14      The National Forest Management Act (NFMA), 16 U.S.C. §§ 1600
15 *et seq.*, provides both procedural and substantive requirements.
16 Procedurally, it requires the Forest Service to develop and
17 maintain forest resource management plans.  Id. § 1604(a).  After a
18 forest plan is developed, all subsequent agency action, including
19 site-specific plans, like the Champs Project challenged here, must
20 comply with NFMA and the governing forest plan.  Id. § 1604(i); see
21 Lands Council v. McNair (Lands Council II), 537 F.3d 981, 989 (9th
22 Cir. 2008).  The National Environmental Policy Act (NEPA), 42
23 U.S.C. §§ 4321 *et seq.*, contains additional procedural
24 requirements.  Its purposes are to ensure the decision-maker will
25 have detailed information on environmental impacts and to provide
26 that information to the public.  Inland Empire Pub. Lands Council
27 v. U.S. Forest Serv., 88 F.3d 754, 758 (9th Cir. 1996).  The Forest
28 Service must prepare an EIS, which identifies environmental effects

1  and alternative courses of action, when undertaking any management
2  project. Id.; 42 U.S.C. § 4332(2)(C). "In contrast to NFMA, NEPA
3  exists to ensure a process, not to mandate particular results."
4  Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1063 (9th
5  Cir. 2002). The agency must only take a "hard look" at its
6  proposed action. Id. at 1070.
7      The Administrative Procedure Act ("APA") provides the
8  authority for the Court's review of decisions under NEPA and NFMA.
9  Lands Council II, 537 F.3d at 987. Under the APA, an agency
10 decision will be set aside only if it is "arbitrary, capricious, an
11 abuse of discretion, or otherwise not in accordance with law." 5
12 U.S.C. § 706(s)(A); see Ecology Ctr., Inc. v. Austin, 430 F.3d
13 1057, 1062 (9th Cir. 2005). "Review under the arbitrary and
14 capricious standard is narrow, and the reviewing court may not
15 substitute its judgment for that of the agency." Earth Island
16 Inst. v. U.S. Forest Serv., 442 F.3d 1147, 1156 (9th Cir. 2006).
17 Rather, the Court:

> Will reverse a decision as arbitrary and capricious
> only if the agency relied on factors Congress did not
> intend it to consider, has entirely failed to consider
> an important aspect of the problem, or offered an
> explanation 'that runs counter to the evidence before
> the agency or is so implausible that it could not be
> ascribed to a difference in view or the product of
> agency expertise.' Id.

23  B.  The SEA

24     The Forest Service created the SEA in response to the Court's
25 previous order finding that the Forest Service had violated NEPA by
26 using (and representing to the public) 365 as the "SDI-Max" value
27 for Ponderosa pines, when the research upon which the Forest

5

Service relied stated that the SDI-Max for ponderosa pines is 571.[1]

The Court held that:

> The Forest Service's misinterpretation of Oliver (1995) and erroneous use of limiting-SDI 365 as the SDI-Max value for Ponderosa pine corrupted the scientific accuracy and integrity of its NEPA analysis. Agencies simply do not have the discretion to arbitrarily and capriciously alter a scientifically set value or deviate from a forest planning directive and still comply with NEPA. The Forest Service has not provided a reasoned explanation for its decision to use a limiting-SDI value when its binding Champs EA provides it will use an SDI-Max value for thinning.

Earth Island, 2009 WL 2423478 at *8.

In the SEA, the Forest Service explains that while the proposed project is still based on an SDI of 365, the Forest Service is no longer using the terminology "SDI-Max" or "limiting-SDI" but rather disclosing that SDI 365 is the value being used in the project, regardless of what it is called. The Court noted that Defendants are free to design a project using some percentage of limiting-SDI as their benchmark for thinning, but chose not to do so, and instead informed the public that they designed a project using SDI-Max. Earth Island, 2009 WL 2423478 at *7. In contrast, the SEA informs the public that the project is intended to reduce stand density below an SDI of 365, since that is the density at which bark beetle outbreaks present a serious risk of mortality. ARS 000054.

As discussed at length in the papers and during oral argument, Plaintiff opposes the conclusions of the SEA, because of the Forest Service's continued use of SDI-365, which Plaintiff contends is scientifically unsound. Plaintiff argues that the Forest Service's

---

[1] See the Court's previous orders, Earth Island Institute, 2009 WL 2423478 and Earth Island Institute, 2009 WL 4163846 for a full discussion of SDI, SDI Max and limiting SDI.

6

continued reliance on Oliver (1995) and the other studies that it relied on previously in the EA, renders the SEA in violation of NEPA for the same reasons as the EA.  By basing the project on scientific data that Plaintiff asserts is erroneous, Plaintiff and its expert Dr. Hanson maintain that Defendants failed to ensure the scientific accuracy and integrity of the project, and have artificially created a need to intensively log medium and large trees from the project area.

    However, unlike the EA, the SEA informs the public that the Champs Project was designed utilizing an SDI of 365, because that is the SDI at which Ponderosa pine stands suffer losses when bark beetles are present.  ARS 000056.  The SEA clarifies that the goal of the project is specifically to thin to 60% of SDI 365 (not SDI-Max, or SDI-limiting).  While Plaintiff does not view this as sufficient to cure the NEPA violation identified in the Court's injunction order, it was this transparency and disclosure that the Court identified as missing from the previous EA.  Use of the value SDI 365 did not constitute the NEPA violation, rather it was the misrepresentation to the public that SDI 365 was the SDI-Max for Ponderosa pines, not SDI 571, (when the Champs Project was allegedly designed based on the SDI-Max), that the Court found to be arbitrary and capricious in violation of NEPA.

    In addition to SDI, the SEA also discussed other issues of contention that had been raised previously in litigation, in an attempt by the Forest Service to clarify the project for the public and to avoid future litigation.  The SEA explains the basis for the Forest Services' use of basal area data and the methodology used to calculate basal area figures provided in the EA, the role of the

Blackwell Memo in development of the EA, the EA's consideration of a range of alternatives to the project, the impact of the project on snags and wildlife, and conifer regeneration after group selection.

The Court has reviewed the administrative record, and in oral argument the parties discussed at length the various studies upon which the Forest Service relied.  Because of the high level of deference given to an agency's decisions, the Court defers to the Forest Service and its analysis as presented in the SEA.  See e.g. River Runners for Wilderness v. Martin, 593 F.3d 1064, 1070 (9th Cir. 2010) ("The agency's action need only be a reasonable, not the best or most reasonable, decision"); Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) ("when specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if as an original matter, a court might find contrary views more persuasive.").  Further, "NEPA imposes only procedural requirements to ensure that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Winter v. NRDC, 555 U.S. 7, 23 (2008) (internal quotations omitted).  "NEPA . . . simply guarantees a particular procedure, not a particular result." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 737 (1998).

The Forest Service based the Champs Project on studies and research that support it.  While Plaintiff disagrees with the science relied on by the Forest Service, this Court must give deference to Defendants, as they relied on their experts and took reasonable actions.  The Forest Service did not act arbitrarily or

8

capriciously in designing the Champs Project to maintain SDI levels below 365. Accordingly, the Court finds that Defendants' use of SDI 365 in designing the Champs project, and the disclosure to the public in the SEA regarding use of this value, is no longer in violation of NEPA.

### C. Issues Not Previously Addressed

The Court turns next to the argument that additional issues previously raised by Plaintiff, but not addressed by the Court, constitute NEPA violations for which this Court should keep the current injunction in place.

First, Plaintiff argues that Defendants failed to adequately consider a reasonable range of alternatives. The Forest Service developed nine alternative plans, and ultimately selected the current project from among the nine alternatives. Plaintiff asserts that the Forest Service arbitrarily dismissed from detailed consideration two less intensive alternatives which Plaintiff favors, constituting a violation of NEPA not cured by the SEA. Plaintiff further argues that the Forest Service restricted full consideration of alternatives so it could implement the Blackwell Memo.

The Forest Service argues that since the purpose of the project includes improving forest health, reducing the risk of tree mortality from bark beetle infestations, and contributing to community economic stability (see ARS 000068 describing the six elements of the Purpose and Need statement), it considered, but ultimately eliminated from detailed consideration those alternatives that did not meet all three criteria in the stated purpose of the project. Additionally, the SEA specifically

9

addresses the Blackwell Memo and notes that the Forest Service did not rely on this memo as setting forth binding direction, ARS 000066, nor did it eliminate any alternatives from detailed consideration because of the memo.  ARS 000069.

The SEA explains the Forest Service's consideration of each of the alternatives, including those alternatives that Plaintiff favors.  The SEA also explains the Forest Service's reasons for choosing the alternative that was ultimately selected.  This Court does not find the Forest Service's review of alternatives, or choice of alternative 9+, to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(s)(A); see Ecology Ctr., Inc., 430 F.3d at 1062.  Further, courts have afforded agencies considerable discretion to define the purpose and need of a project.  Westlands Water Dist. v. U.S. Dep't of the Interior, 376 F.3d 853, 866 (9th Cir. 2004) (discussing evaluation of an Environmental Impact Statement); Friends of Se.'s Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998) (same). Accordingly, under the narrow and deferential standard of review that this Court must follow, the Forest Service did not violate NEPA when it considered a range of alternatives and selected the current project.

Next, Plaintiff argues that Defendants used inaccurate basal area methods and analysis in developing the EA and SEA, thus violating NEPA.  Defendants' basal area calculations used in determining which stands to thin were discussed at length at the hearing, as well as in the papers.  The SEA explains Defendants' methodology, including the decision not to compare current and historic basal area densities, and the exclusion from analysis of

data plots with 60 square feet of basal areas or less.  The project proposes to thin only areas that exceed 60 square feet of basal area, thus the Forest Service analyzed data only for plots that it intends to thin.  The Forest Service used the basal area data in its modeling program, and developed basal area goals to achieve desired future conditions for increased forest health and decreased fire risk.  ARS 000062-63.

While such methodology and analysis may not be Plaintiff's preferred methodology, or even the methodology and analysis the Court would have chosen to employ, the Court finds that Defendants' basal area methodology and analysis does not violate NEPA.  The reviewing court's task is to "insure a fully informed and well-considered decision, not necessarily a decision that [the court] . . . would have reached had [it] been [a] member of the decision making unit of the agency."  Vt. Yankee Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978).  Defendants' decision to exclude from analysis data plots with basal areas of 60 square feet or less, and their decision not to compare historical and current basal area densities, were informed and well considered decisions, carefully explained in the SEA, and do not constitute  NEPA violations.

Lastly, Plaintiff argues that the EA and SEA do not sufficiently analyze the project's future adverse impacts to cavity-nesting wildlife.  The SEA specifically addressed this allegation, by including a lengthy section discussing the potential impact of the project on snag retention and recruitment, and cavity nesting wildlife.  See ARS 000074-86.  The SEA, making reference to studies included in the administrative record, analyzed effects of

the project on birds and other cavity nesting wildlife, and determined that neither snag recruitment and retention nor snag-dependent species would be significantly affected by the project, in the short or long term.  Plaintiff disagrees with the analysis and asserts that it is inadequate.  However, the Court finds the analysis to be reasonable and based on detailed information considered by the Forest Service.  The Forest Service did not act arbitrarily or capriciously in analyzing the Champs Project's impact on snags and snag-dependant wildlife and selecting it as an appropriate project that would not significantly impact such species.

In sum, having carefully reviewed all issues raised by the parties, the Court finds that Defendants have satisfied the judgment, and dissolution under Rule 60(b)(5) is appropriate.

In its brief in opposition to the motion to dissolve the injunction, Plaintiff also contends that the injunction should not be dissolved because the Forest Service has not analyzed the effects of two other nearby projects (Ebey and Cowbell) on the Champs Project.  Plaintiff asks the Court to stay any order dissolving the injunction, to allow Plaintiff to amend or supplement its complaint to include argument on the issues discussed above as well as argument that the SEA does not analyze the cumulative effects of nearby projects.  As the Court stated at oral argument, the parties already briefed, at summary judgment and for the current motion, sufficient argument on the issues that were not previously decided by the Court.  Further, the Forest Service concluded that none of the resource areas or species considered in [the Champs or Ebey projects] overlapped with the other project.

ARS 223-24. NEPA requires agencies to consider the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. See Idaho Sporting Congress, Inc. v. Rittenhouse, 305 F.3d 957, 972 (9th Cir. 2002); 40 C.F.R. § 1508.7. Plaintiff did not identify any effects from the nearby projects that would have a cumulative impact on the Champs Project, and the Court will not stay dissolution of the injunction for this undeveloped claim.

### III. ORDER

For the reasons set forth above, Defendants' Motion to Dissolve the Injunction is GRANTED. The injunction is dissolved effective the date of this order.

IT IS SO ORDERED.

Dated: September 26, 2011

_____
JOHN A. MENDEZ,
UNITED STATES DISTRICT JUDGE